IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SAMUEL UPTHEGROVE,

        Plaintiff,

   v.

KEVIN CARR, KEVIN KALLAS,
SCOTT ECKSTEIN, STEVE SCHEULER,
JOHN KIND, RYAN BAUMANN, and
JAY VAN LANEN,

        Defendants.

OPINION & ORDER

Case No. 18-cv-847-wmc

*Pro se* plaintiff Samuel Upthegrove is proceeding with Eighth Amendment challenges to the response of Green Bay Correctional Institution ("GBCI") officials to his mental health needs. On multiple occasions since commencing suit, Upthegrove has requested this court's preliminary intervention, raising concerns that GBCI officials are failing to take adequate measures to prevent him from committing self-harm. (Dkt. ##2, 46.) Each time, after requesting updates from Upthegrove's care providers and GBCI officials, the court has concluded that, while Upthegrove's mental health challenges are substantial and ongoing, GBCI's response to his specific needs do not support his claim of deliberate indifference, nor support preliminary judicial intervention to prevent self-harm. (Dkt. ##22, 50.) After briefing was completed on defendants' motion for summary judgment on their affirmative defense of release (dkt. #64), Upthegrove submitted a new request for a temporary restraining order, this time asking the court to enjoin GBCI officials from changing his mental health clinician. (Dkt. #75.) For the reasons that follow briefly, the court will deny this motion as well.

BACKGROUND

Specifically, in a letter dated June 18, 2020, Upthegrove requested that the court issue a temporary restraining order "prohibiting Defendants from switching my assigned psychotherapist from the one I have been working with for a year, Ms. Katrina Dorow-Stevens." (Dkt. #75.) In his letter, Upthegrove represents that he met with Dorow-Stevens on June 18, and she informed him that GBCI's warden and other administrators were reassigning clinicians based on the last digit of the prisoners' Wisconsin Department of Corrections ("DOC") number. Upthegrove further represents that the practice of passing prisoners from clinician to clinician is one of the many deficiencies in GBCI's handling of prisoner mental health. Upthegrove also claims that: (1) GBCI's psychological services unit ("PSU") recently lost a supervisor and three psychologists, but those PSU staff members have not been replaced; (2) PSU is not doing group therapy; and (3) PSU staff have not taken any steps to relieve the stress of lockdown due to the COVID-19 pandemic. Upthegrove adds that wearing a mask forces him to re-live childhood trauma, and even though he reported as much to staff, they have done nothing to address this trauma.

Due to these various, recent events, Upthegrove again claims that he is in crisis, fighting the urge to cut himself and swallow razors that he has been able to purchase from canteen. Upthegrove also claims to possess 9500 mg of Tylenol that he was also able to obtain from canteen. Finally, Upthegrove claims that he spoke with GBCI Sergeant Lannoye about all of these issues, and also raised them in person and in writing with his psychologist Dorow-Stevens.

In opposition, defendants chose not to offer declarations from Upthegrove's clinicians, out of concern for damaging the therapist/client relationship, although presumably Upthegrove will have to waive that privilege eventually to proceed with his claims in this case.  Instead, defendants acknowledge GBCI's constrained operations in light of the COVID-19 pandemic, and they provide a general outline of Upthegrove's recent mental health services.  Basically, Upthegrove has been seen by PSU clinicians and his psychiatrist, Dr. Gary Maier, numerous times since the start of the pandemic.  Indeed, as of June 26, 2020, defendants represent that Upthegrove had been seen 13 times by PSU clinicians.  Moreover, the records of those interactions reflect that Upthegrove has expressed concerns about:  changing clinicians, because it means having to re-tell his story so many times; his cellmate; the current political climate; and the frustrations related to being in lockdown for so long.  However, since Upthegrove continues to notify staff appropriately when he is in crisis, and before he engages in self-harming behaviors, and more importantly, since GBCI staff are responding to those communications, defendants' position is that court intervention is unnecessary.

In reply, Upthegrove did not dispute that he has received consistent visits from PSU staff.  Instead, on July 29, 2020, Upthegrove supplemented his motion with another letter stating that on July 28, 2020, he cut himself with a razor blade from a shaver.  After cutting himself, Upthegrove then contacted unit staff, who called his new clinician, Ms. Blackburn.  According to Upthegrove, Blackburn spoke with him briefly from outside of his cell (thus, a non-confidential area).  While Blackburn also agreed to meet with him more formally, she explained it could only be for a shortened, 30-minute session in light of PSU's staff

3

shortage. Upthegrove further represents that a nurse then treated his cuts with antibiotic ointment, and he needed no follow-up further treatment. However, when Upthegrove asked to see Blackburn again, and he was apparently told that he would not see her again for another week.

In the same July 29 letter, Upthegrove adds that he has not been taking his antidepressant medication, apparently because he has to take it from a plastic cup that is stored in an open, high traffic area, and because he also has to use a self-serve water dispenser to take it. Upthegrove argues that there are too many risks associated with taking his medication in this way, including that he is not allowed to use his own water cup. Upthegrove closes his July 29 letter by stating that he is feeling stressed out, helpless and hopeless, and is afraid that he will kill himself.

OPINION

After considering Upthegrove's representations and the records submitted by defendants, the court is still unable to intervene preliminarily to require any modification to Upthegrove's mental health treatment. To begin, "[a] preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) (internal citation omitted). Under the Seventh Circuit approach, a district court is to evaluate plaintiff's claim for relief in two phases. "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; *and*

4

(3) he has a reasonable likelihood of success on the merits." *Id.* at 661-62 (emphasis added).

As for the third of these required showings, Upthegrove's and defendants' submissions to date do *not* suggest any likelihood of success on the merits of any claim related to the reassignment of his clinician, since he does not have a right to the clinician of his choice. However much Upthegrove may disagree with GBCI's staffing changes, or may well benefit from a greater continuity of care, those changes do not rise to a level of deliberate indifference on the part of defendants, much less such indifference to support the court's grant of a preliminary injunction before getting a picture of the full record. *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, Forbes is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Rather, by Upthegrove's own account, GBCI has lost several PSU staff recently, and while unfortunate, it is understandable that prison administrators have been reassigning clinicians as needed. As such, these changes simply do not evince a conscious disregard of the risk that Upthegrove might harm himself.

Moreover, beyond noting that his prior psychologist was much more familiar with his history, diagnoses, and therapy, Upthegrove has submitted no evidence suggesting that other staff -- who from the available records also appear well-informed about his history and tendency to self-harm -- have not responded promptly and appropriately to his reports of being in crisis. Rather, consistent with the court's previous observations about Upthegrove's care, PSU clinicians appear to be continuing their efforts to meet with

5

Upthegrove consistently, as the staffing and lockdown procedures allow, and to address his mental health concerns.  (*See* dkt. #22, at 19; dkt. #50, at 6.)

Although the court does not underestimate the additional mental strain that the COVID-pandemic and lockdown procedures have placed on prisoners at GBCI, including plaintiff, the record here continues to provide no basis to conclude that GBCI staff are responding to his ongoing need for mental health treatment with deliberate indifference. As the court has also recognized in other cases involving threats of self-harm, there is a difficult balance that must be struck between needing judicial intervention for lack of adequate care and the court being manipulated into enabling, or worse, reinforcing self-harm.  *See, e.g.*, *Goodvine v. Ankarlo,* 9 F. Supp. 3d 899, 948-49 (W.D. Wis. 2014); *Davis v. Harding,* No. 12-cv-559-wmc, 2014 WL 4976605, at *1 (W.D. Wis. Oct. 3, 2014); *Upthegrove v. Baird*, No. 15-cv-509-wmc, 2017 WL 53620, at *4 (W.D. Wis. Jan. 4, 2017).

Furthermore, even if Upthegrove's recent submissions supported a finding of deliberate indifference by GBCI's officials, his request that the court direct defendants to provide a *particular* provider to treat him would almost certainly exceed its constitutional authority.  As Upthegrove knows well himself at this point, the PLRA significantly limits the court's authority to enter injunctions in the prison context, directing instead that "remedial injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and use the least intrusive means necessary to correct the violation of the Federal right."  *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012) (quoting 18 U.S.C. § 3626(a)(1)(A)).  Setting aside the fact that GBCI cannot control when staff leave that institution, an order precluding defendants from changing his

6

mental health provider strips GBCI administrators and mental health providers -- who are undoubtedly better equipped to assess the specific mental health needs of the prison population -- from exercising the discretion necessary for them to provide prisoners proper health care.  In other words, it is neither the role of the court to step into the shoes of GBCI's health administrators and providers, nor to make granular decisions about an inmate's treatment.  Accordingly, Upthegrove's motion for preliminary relief must again be denied.

      The court will end by briefly discussing Upthegrove's additional comments that:  he has access to razor and large amounts of Tylenol from the canteen; and he has recently stopped taking his medication out of concern that he will be exposed to the coronavirus.  Starting with the former concern, Upthegrove does not specifically request relief related to his access to these items, but he implies that his ability to purchase them demonstrates defendants' deliberate indifference.  On this record, the court disagrees.  Upthegrove does not say how he obtained those items, whether he currently is restricted from purchasing them, or whether other prisoners have passed them to him.  Obviously, GBCI staff would not just be wise to take measures to ensure that Upthegrove does not have access to these items, they have an obligation to take all reasonable steps to prevent access if plaintiff's self-harm is the product of a diagnosed mental illness, as it seems to be here.  Accordingly, the court will direct defense counsel to forward this order to put defendants and other appropriate officials within GBCI of the need to address this risk, if not having done so already.

Of course, it is entirely possible the reason Upthegrove was able to obtain a razor is because he is currently housed in the general population, rather than a restrictive housing unit, which Upthegrove understandably prefers to avoid. In fact, Upthegrove previously sought a temporary restraining order asking for *removal* from restrictive housing, which the court denied because of the need to defer to the judgment of GBCI officials as to the risk this might create. (*See* dkt. #50, at 6.) If so, Upthegrove's implied threat about his access to canteen items that he may use to self-harm only highlights the fact that the court must leave the details to Upthegrove's placement and mental health care to the professionals at GBCI.

Finally, as for Upthegrove's decision not to take his medication out of fears for exposure to the coronavirus, medication distribution procedures in light of the COVID-19 pandemic are not a part of this lawsuit. Rather, Upthegrove is proceeding on claims challenging GBCI's policies and procedures related to his mental health care, not on any claims related to the safety of medication distribution. As such, except as possible evidence of deliberate indifference to his mental health needs, he is not entitled to any injunctive relief related to the staffs' administration of his medication during the pandemic, nor to injunctive relief related to measures GBCI staff may be taking to prevent the spread of coronavirus within that institution. To the extent Upthegrove believes that he is at risk of contracting COVID-19 at GBCI, and that staff are consciously disregarding that risk in

distributing his medication, he would first need to exhaust his administrative remedies with respect to such a claim, and then file a separate lawsuit seeking injunctive relief.[1]

ORDER

IT IS ORDERED that:

1) Plaintiff Samuel Upthegrove's motion for a temporary restraining order (dkt. #75) is DENIED.

2) Defense counsel is DIRECTED to forward this opinion and order to defendants, noting Upthegrove's representation of ongoing access through the canteen to items such as razors and Tylenol, as well as current possession of a stockpile of both, with a predisposition to self-harm and suicidal ideation.

Entered this 23rd day of September, 2020.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge

---

[1] If Upthegrove goes this route, he may wish to consider two issues.  First, as of today, the DOC reports that 304 prisoners have tested positive for COVID-19 (of which just 35 are active positive cases), while 2,427 prisoners have tested negative, https://doc.wi.gov/Pages/COVID19(Coronavirus)/COVID19TestingDashboard.aspx, and 40 staff members have tested positive (it is unknown how many of those are still active positive cases), https://doc.wi.gov/Pages/COVID19(Coronavirus)/EmployeeConfirmedCases/COVID19EmployeeConfirmedCases.aspx.  Without a change in those numbers sufficient to suggest an outbreak of coronavirus at GBCI *and* a failure by GBCI staff to modify the medication distribution procedures further than it has already, Upthegrove is unlikely to be able to state a viable constitutional claim for deliberate indifference that would pass muster at screening.  Second, given that such a lawsuit would involve events that are taking place within Green Bay, Wisconsin, involving defendants that reside near GBCI, it would be likely inappropriate for Upthegrove to file such a lawsuit in the Western District of Wisconsin.